UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **THE SHAWNEE TRIBE,** | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 20-cv-1999 (APM) |
| **STEVEN T. MNUCHIN, in his official capacity as Secretary of Treasury, et al.,** | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Shawnee Tribe asks the court for an order preliminarily enjoining the Secretary of the Department of Treasury ("Secretary") from distributing not less than $12 million in funds remaining of the $8 billion that Congress allocated under Title V of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to assist Tribal governments with expenditures incurred due to the COVID-19 pandemic. *See* Pl.'s Ex Parte Mot. for TRO, ECF No. 3 [hereinafter Pl.'s Mot.].[1]  Plaintiff challenges the manner in which the Secretary allocated a portion of the $8 billion.  Specifically, on May 5, 2020, the Department of Treasury announced that the first tranche of CARES Act funds disbursement would rely on "Tribal population data used by the Department of Housing and Urban Development (HUD) in connection with the Indian Housing Block Grant (IHBG) Program."  *See* U.S. DEP'T OF TREASURY, Coronavirus Relief Fund

---

[1] Plaintiff originally brought this action in the Northern District of Oklahoma, where this motion was styled as an "Ex Parte Motion for Temporary Restraining Order" ("TRO"), despite also seeking a preliminary injunction. *Shawnee Tribe v. Mnuchin, et al.*, No. 20-cv-1491, ECF No. 3.  On July 28, 2020, the Northern District of Oklahoma denied Plaintiff's request for a TRO and ordered the case transferred to this court under the first-to-file rule.  *See* Opinion and Order, *Shawnee Tribe v. Mnuchin, et al.*, No. 20-cv-1491 (N.D. Okl. July 28, 2020), ECF No. 27.  Thus, the only issue remaining for this court's consideration is Plaintiff's request for a preliminary injunction.

Allocations to Tribal Governments (May 5, 2020) [hereinafter Allocation Mem.], at 2, available at https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf (last accessed on August 18, 2020).  Plaintiff contests the Secretary's selection of the HUD tribal population data as arbitrary and capricious in violation of the Administrative Procedure Act ("APA").

This is the second case to come before this court challenging the Secretary's use of the HUD tribal population data.  In the first case, the Prairie Band Potawatomi Nation argued that the Secretary's decision to rely on the HUD tribal population data was arbitrary and capricious because it undercounted the tribe's actual population.  *See Prairie Band Potawatomi Nation v. Mnuchin*, No. 20-cv-1491 (APM), 2020 WL 3402298 (D.D.C. June 11, 2020).  The court denied the *Prairie Band* plaintiff's motion, in part, on the ground that the manner in which the Secretary allocated the lump-sum CARES Act appropriation was not a reviewable agency action under the APA.  *Id.* at *1.  Plaintiff Shawnee Tribe now attempts to avoid that conclusion, arguing not just that the HUD tribal population data was flawed, but that it was "objectively false" because it counts the Shawnee Tribe as having *zero* enrolled members when, in fact, the Tribe has more than 2,113 tribal citizens.  *See* Pl.'s Mot. at 1–2.

The Shawnee Tribe's argument fares no better than the one asserted in *Prairie Band*.  The Secretary's selection of the HUD tribal population data set, however imperfect it may be, is a discretionary agency action that is not subject to judicial review.  For the reasons stated below, Plaintiff's motion for injunctive relief is denied. [2]

---

[2] As in *Prairie Band*, the court incorporates by reference the factual background and the injunction standard set forth in *Agua Caliente Band of Cahuilla Indians v. Mnuchin*, No. 20-cv-01136 (APM), 2020 WL 2331774 (D.D.C. May 11, 2020), and *Confederated Tribes of Chehalis Reservation v. Mnuchin*, No. 20-cv-01002 (APM), 2020 WL 1984297 (D.D.C. Apr. 27, 2020).

## I.

In *Prairie Band*, this court held that the plaintiff had failed to demonstrate a likelihood of success on the merits because, under the Supreme Court's decision in *Lincoln v. Vigil*, "as long as an agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) of the APA gives the courts no leave to intrude. To that extent, the decision to allocate funds is committed to agency discretion by law." *Prairie Band*, 2020 WL 3402298, at *1 (cleaned up) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993)). Because the plaintiff in *Prairie Band* had made no allegation that "the Secretary [had] allocated CARES Act funds for anything other than their stated statutory purpose," the court found that the population-based allocation was not subject to judicial review. *Id.* at *2.

Notwithstanding *Prairie Band*, Plaintiff Shawnee Tribe insists that the Secretary's selection of the HUD tribal population data is reviewable. It so argues for multiple reasons. First, it contends that this court in *Prairie Band* made a threshold error because it "failed to consider that the APA presumes review, even where lump sum appropriations are at issue." Pl.'s Reply in Supp. of Pl.'s Mot., ECF No. 23 [hereinafter Pl.'s Reply], at 5. That argument misstates the law. In this Circuit, a "presumption of *non*-reviewability" attaches to an agency's "allocation of funds from a lump-sum appropriation." *See Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (internal quotation marks omitted) (emphasis added). The court applies this presumption of non-reviewability here, just as it did in *Prairie Band*.

Next, Plaintiff maintains that this court's reliance on *Vigil* was misplaced. *See* Pl.'s Reply at 4. Plaintiff argues that, "[u]nlike in *Vigil* where there was no statutory language on the proper use or administration of the appropriated funds, Title V's statutory scheme does contain limitations on the allocation and use of funds, such that a reviewing court can discern the intent of Congress."

3

*Id.* (citation omitted). But the CARES Act evinces no greater congressional intent to constrain agency action than the statutes at issue in *Vigil*. *See Policy & Research, LLC v. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018) (stating that where "an agency's action is presumptively *un*reviewable, [ ] the [c]ourt can only review the agency's decision if the 'operative' statute or regulations provide 'clear guidelines by which to do so, or otherwise evince[s] an intent to constrain the [agency's] discretion.'" (third and fourth alterations in original) (quoting *Drake v. FAA*, 291 F.3d 59, 71 (D.C. Cir. 2002))). In *Vigil*, the statutes at issue concerned the delivery of health services to Indian tribes. One statute, the Snyder Act, authorized the Indian Health Service to "'expend such moneys as Congress from time to time [finds] appropriate, for the benefit, care, and assistances of the Indians,' for the 'relief of distress and conservation of health.'" 508 U.S. at 185 (quoting 25 U.S.C. § 13). The other statute, the Improvement Act, authorized expenditures for, among other things, Indian mental-health care and, specifically, for "therapeutic and residential treatment centers." *Id.* (quoting 25 U.S.C. § 1621(a)(4)(D)). The CARES Act's broad purpose is comparable to the breadth of the statues in *Vigil*, and its text is no more limiting. Congress appropriated a lump sum of $8 billion to assist Indian tribes with "necessary expenditures" associated with the coronavirus pandemic, 42 U.S.C. § 801(d)(1), and directed that "the Secretary shall determine, in consultation with the Secretary of the Interior and Indian Tribes," the amounts to be paid to Tribal governments "based on increased expenditures of each such Tribal government . . . relative to aggregate expenditures in fiscal year 2019 by the Tribal government . . . and *determined in such manner as the Secretary determines appropriate*" as to ensure full distribution of the appropriated sum, *id.* § 801(c)(7) (emphasis added). Congress's general instruction to allocate funds based on "increased expenditures" "in such manner as the Secretary determines appropriate" is no more restrictive than the statutory directives at issue in *Vigil*. As this

4

court stated in *Prairie Band*, "Congress gave the Secretary no further guidance on how to allocate the emergency relief funds"; thus, the CARES Act "contains no 'statutory reference point' by which to judge the Secretary's decision to use HUD's population data set, as opposed to some other." 2020 WL 3402298, at *1 (quoting *Drake*, 291 F.3d at 72). That conclusion applies equally here.

At oral argument, Plaintiff for the first time urged the court to take a "bifurcated" review of the Secretary's allocation determination. *See* Hr'g Tr. (draft), Aug. 12, 2020, at 37–38. Plaintiff asserted that, even if the Secretary's top-level decision to use population data as a proxy for increased expenditures is not reviewable, then its secondary decision to select the HUD tribal population set is reviewable. *Id.*; *see also* Pl.'s Suppl. Br. on Reviewability, ECF No. 40 [hereinafter Pl.'s Suppl. Br.], at 4. But that argument fails for at least two reasons.

*First*, it is not clear, as a factual matter, that the Secretary's decision-making was "bifurcated" in the way Plaintiff suggests. The Secretary, on May 5, 2020, announced *both* that he had used tribal population as the metric by which to make the first-tranche allocation of Title V funds *and* that he had relied on the HUD data set to supply the population figures. *See* Allocation Mem. at 2 ("Treasury has determined to distribute 60 percent of the $8 billion reserved for Tribal governments immediately based on population. . . . For purposes of the payments based on Tribal population, Treasury will refer to the Tribal population data used by [HUD] in connection with the [IHBG] program."). Thus, Plaintiff's proposition that the Secretary engaged in a divisible, "bifurcated" decision-making process, the first half of which is reviewable and second half is not, is not borne out by the record.

*Second*, even if the Secretary's decision could be bifurcated in the manner Plaintiff suggests, the selection of the HUD tribal population data set is no more reviewable than the initial

decision to use population as a proxy for increased expenditures.  Congress provided that the allocation of Title V funds to Tribal governments would be "determined in such manner as the Secretary determines appropriate."  42 U.S.C. § 801(c)(7).  Far from cabining the Secretary's discretion, Congress codified it.  So, the Secretary's choice of the HUD data over perhaps more comprehensive, and even more accurate, tribal population statistics is not subject to judicial review.  Nor did the Secretary limit his own discretion by selecting population as a metric for allocating Title V funds.  The Secretary issued no regulations, policy statements, or guidance in connection with that choice.  *See Physicians for Soc. Resp.*, 956 F.3d at 643 ("[J]udicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes." (internal quotation marks omitted) (quoting *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003))).  Such action, if it had occurred, might have signaled an intent to cabin his discretion.  *See, e.g.*, *id.* (holding that General Services Administration regulations implementing the Federal Advisory Committee Act provided judicially manageable standards).  But the mere selection of population as a measure of how to allocate a lump-sum appropriation evinces no such intent.  The Secretary's choice of a particular tribal population data set therefore is not judicially reviewable.

The cases Plaintiff cites in support of its position are inapposite.  Plaintiff cites *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), for the proposition that the "unreviewability" of one agency decision does not preclude the court from reviewing a separate but related decision, Pl.'s Suppl. Br. at 4.  But nothing in *Milk Train* changes the fact that the court needs a statutory or regulatory reference point by which to judge each agency decision.  Nor does *Milk Train* otherwise weigh in Plaintiff's favor.  As the court explained in *Prairie Band*, the relevant portion of *Milk Train* involved a dispute over whether the Secretary of Agriculture's disbursement of funds

complied with its statutory purpose—to cover milk producers' "economic losses incurred during 1999"—where the plaintiff claimed that the Secretary was using 1997 and 1998 data to calculate 1999 losses. *See Prairie Band*, 2020 WL 3402298 at *1 (quoting *Milk Train*, 310 F.3d at 752). "Plaintiff makes no comparable allegation here," where it "does not allege that the Secretary allocated CARES Act funds for anything other than their stated statutory purpose—to assist Tribal governments to combat the COVID-19 pandemic during the year in which those expenses incurred." *Id.* at 1–2.

*Center for Biological Diversity v. Trump*, Case No. 19-cv-00408 (TNM), 2020 WL 1643657 (D.D.C. Apr. 2, 2020), is likewise inapplicable. There, the court examined whether it had authority to review the Secretary of Treasury's expenditure of funds to pay for a border wall between the United States and Mexico. *Id.* at *16. Because the relevant statute "allow[ed] the Treasury Secretary to expend [the] funds [at issue] 'in connection with the law enforcement activities of any Federal Agency,'" *id.* (quoting 31 U.S.C. § 9705(g)(4)(B)), the court found that the statute had cabined the Secretary's discretion to use the funds "for any purpose he chooses," *id.* Specifically, the requirement that the funds had to be spent for "law enforcement activities," provided a "statutory reference point by which the court [was] able to review the Secretary's decision." *Id.* (cleaned up). In this case, on the other hand, the only conceivable statutory reference point is Title V's requirement that the funds be used to cover "necessary expenditures incurred due to the public health emergency with respect to the Coronavirus Disease 2019 (COVID-19)," 42 U.S.C. 801(d)(1), which, as discussed, neither provides "clear guidelines" by which to evaluate the Secretary's selection of the HUD tribal population data nor otherwise "evince[s] an intent to constrain the agency's discretion," *Drake*, 291 F.3d at 71. Finally, Plaintiff cites to *Policy & Research, LLC v. U.S. Department of Health and Human Services*, *see* Pl.'s Suppl. Br. at 2, where

7

the court found that a decision by HHS to cut funding for various teen pregnancy prevention programs was reviewable, 313 F. Supp. 3d at 76–78. But that case is distinguishable because HHS was bound by regulations that "expressly" limited its discretion to "terminate" grant funding without cause. *Id.* at 76. As explained above, no similar agency regulation or policy limits the Secretary's discretion to allocate funds under Title V.

In sum, Plaintiff points to nothing in either the text of the CARES Act or any associated agency action that overcomes the presumption of non-reviewability that attaches to the Secretary's discretion over how to allocate the $8 billion lump-sum appropriation under Title V. The Secretary's choice of the HUD tribal population data to make the first tranche of Title V payments is therefore unreviewable. Accordingly, Plaintiff has not demonstrated a likelihood of success on its APA claim.

## II.

Other preliminary injunction factors also counsel in favor of denying Plaintiff's request.[3] Where, as here, "the Government is the opposing party," the balance of equities and public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiff in this case fairs slightly better on the equities than the plaintiff in *Prairie Band*, where the court found the plaintiff had unjustifiably delayed bringing suit. *See* 2020 WL 3402298, at *2. Here, Plaintiff has shown that it made a concerted effort to resolve the dispute informally before bringing this action, including outreach to the Secretary's office as early as May 13, 2020. *See* Pl.'s Mot. at 6–7 (showing that Plaintiff was actively engaged in discussions with the Secretary's staff regarding a resolution of Plaintiff's complaint, and that Plaintiff also engaged White House and Department of Interior staff and congressional representatives on the issue). Still, the equities favor denying relief. As of

---

[3] The court accepts that Plaintiff would suffer irreparable harm absent injunctive relief.

today, the Secretary has distributed nearly all Title V funds to Tribal governments, and except for a negligible portion, what remains are funds slated for Alaska Native Corporations ("ANCs") that are tied up in litigation before the D.C. Circuit.[4] The monetary burden of Plaintiff's claim would therefore fall almost exclusively on the ANCs, whose share of CARES Act funds, through no fault of their own, has already been delayed far beyond the statutory deadline, *see* 42 U.S.C. § 801(b)(1) (requiring the Secretary to disburse the allocated funds "not later than 30 days after March 27, 2020"). The ANCs' interest in the designated Title V funds weighs against the requested injunctive relief, particularly given the weakness of Plaintiff's claim on the merits.

Plaintiff asserts that granting relief would not harm the ANCs because "tribes receiving [Title V] funds based on false data have no legitimate basis to claim those funds." Pl.'s Mot. at 13. But as noted by the court in the Northern District of Oklahoma in denying Plaintiff's motion for temporary restraining order, that argument "presumes . . . that the Department's formula overpaid [the ANCs]." *See Shawnee Tribe v. Mnuchin*, 20-cv-290, ECF No. 19, at 3 (N.D. Okl. June 29, 2020). "It is possible that [the ANCs'] enrollment numbers were understated too, and that they were shorted in the same way that [Plaintiff] claims that it was." *Id.* Plaintiff has made no showing to the contrary. Granting Plaintiff's request for relief would amount to a judicial rebalancing of the allocation decisions made by the Secretary, which the court is in no position to do.

---

[4] The final disposition of the funds slated for ANCs is dependent on the outcome of the D.C. Circuit's review of this court's Order granting summary judgment for the Secretary in *Confederated Tribes of the Chehalis Reservation v. Mnuchin*, 20-cv-1002, ECF No. 112 (D.D.C. July 14, 2020). The other nominal amount that remains undistributed is due to administrative difficulties in paying grantee Tribal governments. *See* Def.'s Suppl. Mem., ECF No. 34, at 1 n.1.

## III.

For the foregoing reasons, Plaintiff's motion for a preliminary injunction, ECF No. 3, is denied.  The parties shall file a Joint Status Report by August 26, 2020, which proposes a schedule for further proceedings in this matter.

Dated:  August 19, 2020

                                               Amit P. Mehta
                                           United States District Court Judge