# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE SHAWNEE TRIBE,<br><br>    *Plaintiff*,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY, et al.<br><br>    *Defendants*. | Case No. 1:20-cv-01999-APM |
| THE MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY and UNITED STATES OF AMERICA,<br><br>    *Defendants*. | Case No. 1:20-cv-02792-APM |
| PRAIRIE BAND POTAWATOMI NATION,<br><br>    *Plaintiff*,<br><br>    v.<br><br>STEVEN T. MNUCHIN, in his official capacity as SECRETARY, U.S. DEPARTMENT OF TREASURY<br><br>    *Defendant*. | Case No. 1:21-cv-012-APM |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 65.1, Plaintiffs Shawnee Tribe ("Shawnee"), Miccosukee Tribe ("Miccosukee") and Prairie Band Potawatomi Nation ("Prairie Band Potawatomi"), hereby move for summary judgment against Defendants (collectively hereinafter referred to as the "Government") on Plaintiffs' claims for declaratory judgment and for judicial relief under the Administrative Procedure Act ("APA") (5 U.S.C. § 701 *et seq*.). When Congress mandated that the Government allocate $8 billion in funds to "each" Tribal Government "based" on increased expenses related to COVID-19, The Government used an elective federal housing program formula (the Indian Housing Block Grant Data or "IHBG Data") that falsely reported the Shawnee's and Miccosukee's population as zero, and reduced Prairie Band Potawatomi's population by over 83%, for the purposes of distributing CARES Act funding. It is undisputed that these funds were desperately needed by these three tribal governments to help offset the traumatic toll that COVID-19 took on Indian country in general and on these three Plaintiffs in particular. The Government's actions were unreasonable, inexplicable and irrational, thus, preventing Plaintiffs from receiving Title V relief funds to which they were entitled and for which they so desperately need. Critically, the Government has entirely failed to provide any explanation about why it used objectively false data in lieu of the certified population data it had requested, defined, and received because there simply is none. Instead, The Government's decision to use the IHBG data lacks any connection whatsoever to increased COVID-19 expenses and is belied by the very same population data contained within the IHBG spreadsheet only a few columns away. This is akin to pulling numbers out of a hat – the epitome of arbitrary and capricious action.

Accordingly, this Court should enter judgment for Plaintiffs and against Defendants because: (1) the D.C. Circuit has already found that the Government's actions were arbitrary and

capricious, which is now the law of the case; and (2) in any event, the Government's decision to use such data on its face was implausible, had no basis in reasoned decision-making, failed to consider multiple sources of accurate population data and even ignored its sister agency's recommendations. This Motion is supported by the following Memorandum of Points and Authorities.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.   BACKGROUND

### A.   The CARES Act and the Title V Coronavirus Relief Fund

Title V of the CARES Act amends the Social Security Act (42 U.S.C. § 301 *et seq.*), and appropriates $150 billion for "payments to States, Tribal governments, and units of local government." 42 U.S.C. § 801(a)(1). Of the $150 billion, Congress set aside $8 billion for payments to Tribal governments ("Title V funds"). 42 U.S.C. § 801(a)(2)(B). The Plaintiffs are all federally recognized Tribal governments entitled to distributions of Title V funds.

Although Congress mandated that United States Census Bureau ("Census Bureau") population data was to be used to determine the distribution of Title V funds to States and units of local government (42 U.S.C. § 801(8)), there was no such requirement for distributions to Tribal governments.[1] Instead, Congress directed the Secretary of Treasury to pay Title V funds to each Tribal government based on "increased expenditures" directly resulting from COVID-19. 42 U.S.C. § 801(c)(7). In addition, Congress required the Government to consult with both the Secretary of the Interior and with Tribal Governments to select a methodology for distribution of funds. *Id.* Specifically, Congress directed:

> From the amount set aside under subsection (a)(2)(B) for fiscal year 2020,
> the amount paid under this section for fiscal year 2020 to a Tribal

---

[1] Tribal governments are a distinct category from state and local governments in Title V. *See e.g.* 42 U.S.C. § 801(a)(1) (referencing "States, Tribal governments, and units of local government").

government shall be the amount the Secretary shall determine, **in consultation with the Secretary of the Interior and Indian Tribes, that is based on increased expenditures of each such Tribal government … relative to aggregate expenditures in fiscal year 2019 by the Tribal government** … and determined in such manner as the Secretary determines appropriate to ensure that all amounts available under subsection (a)(2)(B) for fiscal year 2020 are distributed to Tribal governments.

*Id.* (emphasis added).

### B. The Government "Consults" with Tribal governments from March 31 to April 13, 2020

As directed by Congress, on April 2, 2020, and April 9, 2020, the Government and the Office of the Assistant Secretary—Indian Affairs ("BIA"), United States Department of the Interior, held telephonic consultation sessions, where federal officials heard from representatives of Tribal governments across the United States. (*See* Exhibit A (produced as AR-03 in Dkt. 61); Exhibit B (produced as AR-04 in Dkt. 61). These consultations were led by Interior and the Government, and included Mr. Dan Kowalski, Senior Advisor to the Secretary, who was authorized by the Secretary of the Government to administer CARES Act relief funds to Tribal governments.

In the preamble to the April 2, 2020 telephone call, Mr. Kowalski explained that he was "not an expert on Tribal issues" (Exhibit B, p. 14:4). He added later that he was "interested in working with BIA and learning from BIA what models are out there for distributing funds" (*id.*, p. 127:14-17). In the ensuing call, representatives from the Government, BIA and Tribal leaders discussed the use of population as a relevant proxy for increased expenditures, based on the obvious rationale that as population increases, so do COVID-related expenditures. (*Id.*, pp. 19:14, 28:14, 71:16). One tribal leader advocated for consideration of Indian Health Services usage and noted that "[m]any tribal members are unable to live within the boundaries and so we want to consider that was well." (*Id.*, p. 134:8-10). Neither the Government nor BIA made any mention of

4

using the Housing and Urban Development formula for the Indian Housing Block Grant program (IHBG Data). (*See generally Id.*).

Instead, on April 13, 2020, the Government solicited from Tribal governments their "Population," defined as the "Total number of Indian Tribe Citizens/Members/Shareholders, as of January 1, 2020." (Exhibit C (Declaration of Michael G. Rossetti ("Rossetti Dec"), Ex. D-2, filed in No. 1:21-cv-00012 at Dkt. 4-6)). Each Plaintiff separately responded to this solicitation by certifying, under oath, current and accurate enrollment figures (the "Certified Tribal Enrollment Data"). (*See* Exhibit D (Declaration of Joseph P. Rupnick ("Rupnick Dec."), Ex. B, filed in No. 1:21-cv-00012 at Dkt. 4-20); Exhibit E).

### C. Plaintiffs' Timely Provide Their Certified Tribal Enrollment to the Government, the Accuracy of Which the Government Never Challenged

There is no dispute that the Plaintiffs timely provided Certified Tribal Enrollment Data by the requested deadline of April 17, 2020. For instance, Prairie Band Potawatomi timely certified to the Government that it had 4,561 enrolled members as of January 1, 2020. (Exhibit D (Rupnick Dec.) ¶ 7). The Shawnee timely certified it had 3,021 enrolled members as of January 1, 2020. (Exhibit E). Miccosukee timely certified that it had 605 enrolled members as of January 1, 2020. (*Id.*).

The Government never challenged the accuracy of these certifications. Specifically, in a non-public memorandum issued on May 5, 2020, the Government credited employment data provided by the Tribes, but criticized the reliability of land size and expenditure data due to "variances, likely due to differences in the methodologies that various Tribes use to determine land size or calculate expenditures." (Exhibit G (produced as AR-06 as noted in Dkt. 61), p. 2.) Yet despite the clear opportunity to do so in the May 5, 2020 memorandum and throughout this case,

the Government has utterly failed to document any such flaw in the Certified Tribal Enrollment Data.

### D.    Without notice, the Government Changed Course and Used a Preexisting HUD Metric to Allocate Funds

After requiring tribes to submit and certify several categories of data by April 17, 2020, the Government changed course – without explanation and without further consultation – and used the IHBG Data from a block grant housing formula in lieu of Certified Tribal Enrollment Data. On May 5, 2020, the Government publicly announced that it elected to immediately award sixty percent of the Title V Funds, or $4.8 billion, "based on Tribal population" (the "Population Award") because "Tribal population [was] expected to correlate reasonably well with the amount of increased expenditures of Tribal governments related directly to the public health emergency, such as increased costs to address medical and public health needs." (Exhibit H (produced as AR-07 as noted in Dkt. 61), p. 2). The Government stated that the remaining forty percent of funds would be distributed at a later date based on employment and expense data. (*Id.*).

In that same May 5, 2020 Announcement, the Government also announced its election to allocate the Population Award by using population data from the IHBG Data. The Government credited, in conclusory fashion, the IHBG Data as a "reliable and consistently-prepared data for the key variable that is used by the Department of Housing and Urban Development in connection with the [IHBG] program." (Exhibit G, p. 2). The Government, however, provided no other explanation as to why this data was superior to enrollment data certified by the Plaintiffs nor did it identify any weakness in the reported data or identify any shortcoming of an enrollment-based approach necessitating its replacement with the IHBG Data. (*See id.*). The Government administrative record also does not shed any light on this deliberation. (Exhibit F (Certification of Administrative Record certifying that the records attached thereto is the full record of information

considered by the Government, which was to be supplemented only by any additional information provided by the Tribal Governments)).

On June 12, 2020, the Government issued a press release acknowledging that had the Government used the reliable data "provided by the Bureau of Indian Affairs, rather than the [census-based IHBG] data," an additional $679 million would have been allocated to certain tribes. (Exhibit I, p. 2). The Government, accordingly, voluntarily withheld that amount "to resolve any potentially adverse decision in litigation," which it deemed "a prudent course" of action (*id.*) and was a clear acknowledgment that the Government may have erred in its use of the IHBG Data.

Notably, the Government's selection of the IHBG Data was not supported by BIA, which "ultimately recommended a distribution formula that relied on population, expense, and employment data." (Exhibit G, p. 2). In the end, the administrative record demonstrates that the Government spontaneously and without explanation chose to use the IHBG Data in lieu of the Certified Tribal Enrollment Data that the Government solicited and received weeks prior, which was contrary to the recommendations of the BIA, the federal agency staffed by subject matter experts in the relevant field. The Government's extraordinary action was based on a memorandum by the Government employee who had, only a few days prior, disclaimed expertise on "Indian Affairs." (*See id.* ("From: Daniel Kowalski"); Exhibit B, p. 14:4).

   E.   **Without explanation, the Government Adapts the IHBG Data in Select Instances to Account for Recognized Weaknesses in the Data in Favor of Some Tribes but Not Others**

At the time the Government adopted the IHBG Data, it recognized that it was inaccurate with respect to at least some tribes. One such example was the decision to set a minimum payment of $100,000 to the "smallest Indian Tribes," defined as populations less than 37 people. (Exhibit H, p. 3.) The purpose of this adjustment was to account for the "relative significance that variations

in population would have at the low end of the range and the greater marginal costs that small Indian Tribes have in providing services to their people." (*Id.*)

The Government's complex marginal cost analysis inexplicably ignored the obviously incorrect IHBG Data for Shawnee and Miccosukee. Thus, while the Government sought to make financial accommodations for the "smallest tribes" with actual populations of less than 37 people, it irrationally and unreasonably included Miccosukee and Shawnee with actual populations of 605 and 3021, respectively. And the Government artificially cut off the Prairie Band Potawatomi's population at 747, compared to its actual population or enrollment of 4,561, causing Prairie Band to receive $12,544,246 less than it would have if its entire population had been considered.[2]

This deliberate use of objectively false data is further unexplained - and unexplainable - in light of the Government's recognition and correction of issues with the IHBG Data with its response to three Indian Tribes – specifically Chicken Ranch, Mohegan and Prairie Island – that were "not included in the IHBG population data." Recognizing this issue, the Government contacted HUD for data on these tribes. (*See* Exhibit J.) This stands in glaring contrast to the Government's failure to acknowledge, let alone correct, the obviously false data showing zero population for 25 existing Tribes. There is no evidence in the administrative record that excuses or explains the Government's faulty decision-making here.

---

[2] In prior analysis of its shortfall, Prairie Band Potawatomi had relied on an IHBG Data value of 883 based on a provisional dataset that was published by the Government at the time that the IHBG Data was announced as the relevant metric. (*See generally* Exhibit C (Rossetti Dec.)). The administrative record now demonstrates that the final dataset on which the Government relied reflected a value of 747 for Prairie Band Potawatomi. (Exhibit K, p. 9.) Prairie Band has therefore recalculated the shortfall caused by the Government's selection of the IHBG Data as $12,544,246, which reflects 3,814 uncounted Prairie Band Potawatomi citizens multiplied by estimated per capita Population Award allocation of $3,289.

**F.      It is Undisputed that Plaintiffs' Populations were Undercounted Due to the Government's Approach**

The IHBG Data selected by the Government in lieu of the Tribes' certified and readily available population data showed that certain tribes had a population of zero, which is a legal and factual impossibility for an existing, federally recognized Indian Tribe. And other tribes, such as Prairie Band Potawatomi were grossly undercounted. As stated above, the Shawnee timely certified it had 3,021 enrolled members as of January 1, 2020, but the IHBG Data shows the Shawnee had a population of **<u>zero</u>**. Critically, within the same IHBG Data formula table the Government had before it, and only a few columns over from the zero figure the Government used, HUD also reported, albeit incorrectly, that the Shawnee Tribe had "2113 enrolled members" ("HUD Enrollment Data"). (Exhibit K (produced as AR-02 in Dkt. 61), p. 9.)

Likewise, Miccosukee had 605 enrolled members as of January 1, 2020 but was assigned a **<u>zero</u>** population. In both instances, for the purposes of calculating CARES Act funding distributions, the Government had eliminated 100% of the Shawnee and Miccosukee's tribal population. Based on the Shawnee and Miccosukee IHBG Data of zero, these tribes were awarded a minimum payment of $100,000.

With respect to Prairie Band Potawatomi, it had certified its enrollment membership as 4,561 (Exhibit D ¶ 7) and the HUD Enrollment Data reflected the Prairie Band Potawatomi had 4,841 enrolled members. (Exhibit K, p. 9.) Yet, based on the IHBG Data used by the Government, which is also maintained by HUD, Prairie Band Potawatomi's Population Award of Title V Funds was based on a population of 747. (*Id.* (column: AIAN Persons); Exhibit H (adopting IHBG Data).) Thus, the Government simply eliminated 83% of Prairie Band Potawatomi's population for the purposes of calculating its allocation of Title V funds.

## II.      RELATED LITIGATION

On April 17, 2020, certain Tribal governments commenced actions that were subsequently consolidated. *Confederated Tribes of the Chehalis Reservation v. Mnuchin*, Case No. 1:20-cv-1002 (D.D.C. filed April 17, 2020) (the "Chehalis Litigation"). The Chehalis Litigation will decide whether the Government can treat Alaska Native Corporations ("ANCs") as "Tribal governments" under the CARES Act. *See* 42 U.S.C. § 801(g)(5) (defining "Tribal government" as "the recognized governing body of an Indian Tribe"). The Court of Appeals for the D.C. Circuit recently held that ANCs are not entitled to Title V Funds, which leaves roughly $533 million of Title V Funds unallocated and in the possession of the Government. *Confederated Tribes of the Chehalis Reservation v. Mnuchin*, 976 F.3d 15, 20 (D.C. Cir. 2020); *Miccosukee Tribe of Indians of Florida v. Mnuchin*, D.D.C., Case No. 1:20-cv-2792-APM, Dkt. 40, December 11, 2020 (Joint Status Report indicating that $533 million of Title V Funds remain). The ANCs have filed a petition for writ of *certiorari* to the United States Supreme Court (Case No. 20-544). The Court of Appeals for the D.C. Circuit stayed the appropriation of the Title V Funds pending the outcome of the writ of certiorari and for at least seven (7) days thereafter. *Chehalis Litigation*, No. 20-5204, Document # 1864207 (D.C. Cir. Sept. 30, 2020). With the appropriation preserved, the $553 million of Title V Funds remain subject to Congressional directive to "ensure that all amounts…are distributed to tribal governments." 42 U.S.C. § 801(c)(7). The Government intends to distribute these funds at the conclusion of the Chehalis Litigation. *Chehalis Litigation*, No. 20-5204, Document # 1864090 (D.C. Cir. Sept. 30, 2020).

## III.     PROCEDURAL HISTORY

On June 8, 2020, Plaintiff Prairie Band Potawatomi commenced litigation raising similar claims to those set forth in the instant action. *Prairie Band Potawatomi Nation v. Mnuchin*, Case No. 1:20-cv-01491 (D.D.C.) ("Prior PBPN Litigation"). The United States District Court for the

District of Columbia denied Prairie Band Potawatomi's motion for a preliminary injunction to restrain Title V Funds that had not yet been distributed on the grounds, *inter alia*, that the Government's allocation methodology was committed to agency discretion by law and thus unreviewable under Section 701(a)(2) of the Administrative Procedure Act. *Id.*, Dkt. 22; *see Prior PBPN Litigation*, No. 20-CV-1491 (APM), 2020 WL 3402298, at *1 (D.D.C. June 11, 2020). Nevertheless, the Government sought to set aside $679 million to resolve the claims raised in the Prairie Band Litigation. (Exhibit I, p. 2); *Agua Caliente Band of Cahuilla Indians, et al. v. Mnuchin*, Case No. 1:20-cv-01136-APM, Dkt. 39, (D.D.C. June 12, 2020); *Prior PBPN Litigation*, No. 20-CV-1491 (APM), at Dkt. 29, pp. 4-6 (the Government's counsel proposing set aside for claims of undercounted tribes before Court's consideration of merits of Prairie Band Potawatomi's motion). This Court vetoed the Government's proposal three days later and directed the Government to distribute the $679 million set aside. *Agua Caliente Band of Cahuilla Indians, et al.*, Case No. 1:20-cv-01136-APM, Dkt. 42. Prairie Band Potawatomi voluntarily dismissed its complaint without prejudice on July 9, 2020. *See generally Prior PBPN Litigation*, Case No. 1:20-cv-01491, Dkt. 30 (D.D.C. July 9, 2020).

Meanwhile, on June 18, 2020, Shawnee commenced the instant action in the United States District Court for the Northern District of Oklahoma challenging the Government's allocation of Title V Funds to Tribal governments. After the case was transferred to this Court, this Court denied Shawnee's motion for a preliminary injunction on the basis, *inter alia*, of non-reviewability under the Administrative Procedure Act, citing the Court's decision in the Prior PBPN Litigation. *Shawnee Tribe v. Mnuchin*, No. 1:20-cv-1999-APM, 2020 WL 4816461 (D.D.C. Aug. 19, 2020). This Court then dismissed the complaint. *Shawnee Tribe*, No. 1:20-cv-1999-APM, 2020 WL 5440552, at *4 (D.D.C. Sep. 10, 2020) *rev'd* 984 F.3d 94 (D.C. Cir. 2021). Shawnee pursued an

expedited appeal. Miccosukee, which had filed a related action on July 31, 2020 (Case 1:20-cv-02792-APM), and Prairie Band Potawatomi participated as *amici curiae*.

In a decision issued on January 5, 2021, the D.C. Circuit reversed this Court's holding on reviewability and on the denial of the preliminary injunction. *Shawnee Tribe v. Mnuchin et al.*, 984 F.3d 94, 99-100 (D.C. Cir. 2021). The D.C. Circuit not only found that the Government's decision on the allocation of Title V funds was reviewable (*id.* at 99-101), but also previewed the merits of the case as part of its preliminary injunction analysis. The D.C. Circuit first called attention to the idiosyncrasies of the IHBG Data:

> The IHBG data does not reflect actual tribal enrollment. Instead, it estimates a tribe's "population" in a geographical "formula area" based on population numbers drawn from census projections of the number of individuals who consider themselves "American Indian or Alaska Native" on census forms. See 24 C.F.R. §§ 1000.302, 1000.330; see also May 5 Document at 2. A Tribal government's formula area is defined to be its formula area as it existed in 2003, any of its land that falls into nine categories (including "reservations for federally recognized Indian tribes"), and any other areas added by application of the Tribe and at HUD's discretion. See 24 C.F.R. § 1000.302. A formula area, the Secretary explained, "corresponds broadly with the area of a Tribal government's jurisdiction and other areas to which the Tribal government's provision of services and economic influence extend." May 5 Document at 2–3. Because the IHBG data does not reflect actual enrollment, a tribe's IHBG "population" sometimes exceeds its actual enrollment numbers. 24 C.F.R. § 1000.302. A tribe's IHBG formula area population is thus capped at twice its "enrolled population." Id. § 1000.302(5).

*Id.* at 97.

As to the merits, the court observed:

> The Secretary chose the IHBG formula area population data as a proxy for "increased expenditures." But as the Tribe points out, and as the record demonstrates, the IHBG formula area population data is, at least with respect to some tribes, an unsuitable proxy. Even though the Shawnee Tribe alleges (unchallenged by the Secretary) that it has 3,021 enrolled members and that it had expenditures of some $6.65 million in 2019, the IHBG formula area population data indicates that the Tribe had a population of zero. As a result, the Tribe received the minimum payment of $100,000, even though it "has incurred significant medical and public health expenses

in responding to the devastation resulting from the COVID-19 pandemic" by, for instance, "provid[ing] essential services to its citizens residing on-reservation and off-reservation." The same is likely true for amicus the Miccosukee Tribe—according to its brief, it has 605 enrolled members yet the IHBG data indicates it had zero population—as well as for the Eastern Delaware Band of Indians, which, according to the IHBG data table, had a HUD enrollment figure of 11,014 but a population of zero. Moreover, the Secretary himself acknowledged that the IHBG data was inadequate as a proxy for increased expenditures in some cases when he requested population data from HUD for three tribes that did not participate in the IHBG program…yet he failed to do the same for the Shawnee Tribe, which also does not participate in the program. Nor did the Secretary explain why he failed to seek alternative information for the Shawnee Tribe or the twenty-four other tribes with no IHBG population. On this record, then, the Shawnee Tribe is likely to succeed in its claim that the IHBG data is not a suitable proxy for "increased expenditures."

*Id.* at 102 (internal citation omitted). Based on this analysis, the D.C. Circuit remanded the case to this Court for the prompt entry of a preliminary injunction in favor of the Shawnee plaintiff. *Id.* at 103.

On January 4, 2021, Prairie Band Potawatomi refiled its APA challenge on the same grounds as its original complaint that was voluntarily discontinued. (*Prairie Band Potawatomi Nation v. Mnuchin*, 1:21-cv-00012 (D.D.C.) (Dkt. 1).

After remand, on January 14, 2021, this Court entered a preliminary injunction in favor of Shawnee (Dkt. 55). This Court then consolidated the Miccosukee and Prairie Band Potawatomi cases into Shawnee. All three (3) Plaintiffs now jointly move for summary judgment.

## IV.    LAW AND ARGUMENT

### A.    Standard of Review

The APA authorizes judicial review of federal agency action. 5 U.S.C. § 702. The reviewing court shall hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," (5 U.S.C. § 706(2)(A)), or that fails to observe procedure required by law (5 U.S.C. § 706(2)(D)).

The role of the court under the APA is to "ensur[e] that agencies have engaged in reasoned decision making." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Courts must review "whether the agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made, and whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1, 49 (D.C. Cir. 2019) (internal quotations omitted). As follows, "where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the courts] must undo its action." *BellSouth Corp. v. F.C.C.*, 162 F.3d 1215, 1222 (D.C. Cir. 1999) (citation and quotation omitted). "The agency's statement must be one of reasoning; it must not be just a conclusion; it must articulate a satisfactory explanation for its action." *Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (internal quotations omitted).

Violations of the arbitrary and capricious standard under the APA can take many forms. For example, if the agency fails to provide a factual basis upon which a court may conclude that the agency has actually engaged in reasoned decision-making, it has violated the APA. *Swedish Am. Hosp. v. Sebelius*, 773 F. Supp. 2d 1, 14 (D.D.C. 2011) (requiring an explanation for a challenged action); *see A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995) (noting that an agency is required to explain its decision so the court can fulfill its duty of ensuring non-arbitrary decision-making under the APA). Moreover, an agency that transparently engages in policymaking, but arrives at its discretionary decision "by Ouija board or dart board, rock/paper/scissors, or even the Magic 8 Ball" has still violated the APA's arbitrariness prohibition because its policy determination was not a reasoned one. *Make the Rd. N.Y. v. McAleenan* ("MTRNY"), 405 F. Supp. 3d 1, 47 (D.D.C. 2019), *rev'd on other grounds sub nom.*, *Make the*

*Rd. N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020). An agency similarly violates the APA if it "entirely fail[s] to consider an important aspect of the problem," or if its decision "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, ––– U.S. ––––, 140 S.Ct. 1891, 1910 (2020); *see also Nat. Res. Def. Council v. U.S. E.P.A.*, 808 F.3d 556, 574 (2d Cir. 2015) (overturning agency decision as arbitrary and capricious because it failed to consider an "important aspect of the problem," among other reasons).

Nor may agencies rely on one-sided or unsuitable data, particularly where superior data is available, as was the case here. This fundamental principle has been reinforced by courts repeatedly. Recently, in *Genuine Parts Co. v. Envtl. Prot. Agency*, 890 F.3d 304, 313 (D.C. Cir. 2018), this Court held that "[i]t was arbitrary and capricious for [the agency] to rely on portions of studies in the record that support its position, while ignoring cross sections in those studies that do not." Likewise, in *Lakeland Bus Lines, Inc. v. N.L.R.B.*, 347 F.3d 955, 962-63 (D.C. Cir. 2003), the Court reversed an agency's decision on unfair labor practices because it failed "to take account of contradictory evidence" and engaged in a "clipped view of the record it chose to take." And in *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 195 (D.D.C. 2014), the district court stated that an agency may not "disregard superior data in reaching its conclusion," and held that the agency's final rule was arbitrary and capricious when it did.[3]

---

[3] Even the Government's use of outdated data has been found to be arbitrary and capricious. *Saint Francis Med. Ctr. v. Azar,* 894 F.3d 290, 297-98 (D.C. Cir. 2018) (vacating federal agency's rule as arbitrary and capricious where it relied on outdated data to support its decision to reimburse hospitals at a historically low rate).

"Under any of these circumstances, it is the court's obligation to declare that the challenged rule is procedurally unlawful, and to vacate the agency's action under section 706(2)(A) of the APA." *See Regents*, 140 S.Ct. at 1910; *see also In re Roman Catholic Church of Archdiocese of Santa Fe*, 615 B.R. 644, 653 (Bankr. D.N.M. 2020) (noting, in the context of the CARES Act, "courts retain an important role 'in ensuring the agencies have engaged in reasoned decisionmaking' by examining the reasons for the agency decisions, or lack thereof, and determining 'whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment'") (quoting *Judulang*, 565 U.S. at 53).

There is absolutely no genuine issue of material fact that the Government's use of the IHBG Data was arbitrary and capricious because: (1) the D.C. Circuit has already said so, which is now the law of the case; and (2) in any event, the Government's decision to use such data on its face was implausible, has no basis in reasoned-decisionmaking or in the administrative record, fails to consider an important aspect of the problem and amounts to nothing more than picking a card out of a hat. This Court should enter summary judgment in favor of Plaintiffs.

**B.     The D.C. Circuit has already concluded that the IHBG Data was not a Suitable Proxy for Increased Expenditures for Some Tribes, Including Those at Issue Here.**

No ruling other than finding the Government acted arbitrary and capricious would be consistent with the spirit of the D.C. Circuit's opinion that the IHBG Data was an unsuitable proxy for some tribes, including the Shawnee at issue before it. The law-of-the-case doctrine dictates that "the same issue presented a second time in the same case in the same court should lead to the same result." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (emphasis omitted). The so-called "mandate rule" is a "more powerful version of the law-of-the-case doctrine, which prevents courts from reconsidering issues that have already been decided in the same case." *Am. Council of Blind v. Mnuchin*, 977 F.3d 1, 5 (D.C. Cir. 2020) (citing *Briggs v. Pa. R.R. Co.*, 334

U.S. 304, 306 (1948); *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 597 (D.C. Cir. 2001) (internal quotation marks omitted)). Importantly, the district court cannot "fashion[] a remedy that is 'inconsistent with either the **spirit** or express terms'" of an appellate court holding. *Id.* (citation omitted and emphasis added).

The spirit of the D.C. Circuit's ruling that the Government's use of IHBG Data was inappropriate for some Tribes, including the Shawnee before it, dictates entry of summary judgment here. In its careful analysis, the D.C. Circuit has already concluded that the IHBG Data "is, at least with respect to some tribes, an unsuitable proxy" for increased expenditures, which applies to the zero population and grossly undercounted Plaintiffs in this lawsuit alike. *Shawnee*, 984 F.3d at 102. The D.C. Circuit identified absurdities caused by the Government's blind belief that tribes like Miccosukee and Shawnee could, at once, have COVID-related obligations to zero citizens, while simultaneously possessing knowledge of their substantial population and 2019 expenditures. As the D.C. Circuit noted, the Government's harsh treatment of the zero tribes, like Shawnee and Miccosukee, was not based on reasoned decision-making or cost-benefit analysis, but on apparent ignorance of the shortcomings of the gerrymandered IHBG Data.

Critically, the D.C. Circuit cited the special accommodations that the Government extended to three tribes that had opted out of the IHBG program but the Government failed – without reason or explanation in the record – to extend the same treatment to Shawnee. *Id*. at 102. The Government's special accommodation of these tribes (Chicken Ranch, Mohegan and Prairie Island) demonstrates that the Government had the will, resources and time to deviate from the IHBG Data. The Government, however, arbitrarily failed to extend similar accommodation to the greater number of Tribal governments that were zeroed out in the IHBG Data, like Shawnee and Miccosukee, or tribes like Prairie Band Potawatomi, who were egregiously undercounted. With

the expert guidance of BIA and the accurate data timely supplied by Shawnee, Miccosukee and Prairie Band Potawatomi, these arbitrary impacts were just as knowable (if not known) to the Government and they were far more impactful on the equitable distribution of funds to offset increased expenditures faced by Tribal governments. The fact that many Tribal governments with substantial operations had a zero or minimal IHBG Data was strong *prima facie* evidence that the IHBG Data was an improper proxy for expenditures. Based on these zeroes alone, the Government should have immediately realized that the IHBG Data was obviously factually wrong, which made it unreasonable and irrational to use as a metric for the CARES Act funding. Thus, any ruling other than the Government acted arbitrary and capricious would not comport with the plain language or spirit of D.C. Circuit's holding.

      C.      **Even if this Court were to embark on independent analysis of the Government's actions, the Government's use of the IHBG Data was arbitrary and capricious as a matter of law.**

            1.      **The Government's use of IHBG Data on its face was so implausible that it was arbitrary and capricious.**

There is no dispute in this case that the Shawnee and Miccosukee still exist, which it could not if it had a tribal population of zero as the Government contends. Both Tribes are federally recognized tribes that have existed since time immemorial. The Government determined that the population of the Shawnee and Miccosukee was zero **_after_** it had received the Actual Certified Enrollment Data it defined and requested under the auspices that it was necessary to determine CARES Act Population Awards. Stated differently, the Government has never disputed before this Court or the D.C. Circuit – and it cannot dispute it now – that the Shawnee's and Miccosukee's populations are not zero nor has it disputed the accuracy of the Certified Enrollment Data. The Administrative Record is also devoid of any discussion about the tribes that showed a zero population in the IHBG data. The Government's own record reflects an abject lack of analysis,

deliberation, or other evidence to support its decision to purposefully use objectively false data - instead of the Certified Enrollment Data - in awarding the minimum funds to the Shawnee and Miccosukee. Thus, this decision was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. There is no dispute in this case that the Shawnee Tribe and Miccosukee still exists, which it could not if it had a tribal population of zero. This is quintessential arbitrary and capricious agency action.

>    2.    **The Government's use of IHBG Data runs counter to all the available evidence the Government had before it; thus, it was arbitrary and capricious.**

Similarly, there is no dispute that the Government's use of the IHBG Data runs directly counter to the evidence before the agency, namely, the certified population data it requested and received. Though the Government already had the Plaintiffs' accurate and certified population data from two separate reliable sources, namely, the BIA within Interior and the Tribes themselves, they elected to instead use the inaccurate IHBG population data. This decision resulted in the false finding that the Shawnee and Miccosukee had been depopulated, which is legally and factually impossible, and reduced the Prairie Band Potawatomi population by over 83%. Ironically, the Government ignored the data from the very same organizations with whom Title V expressly required it to consult – the Interior and tribes. Even the District Court noted the curious nature of the Government's actions, which wholly lacks explanation. *See Agua Caliente*, 2020 WL 2331774, at *7 ("Plaintiffs are rightly upset … [where] the 60% distribution made by the agency relied not on data obtained from Indian tribes in the last few weeks, but on population data from [HUD] that was publicly available before the pandemic struck"). There is no dispute in this case that the Government had superior data available to determine the Shawnee and Miccosukee were not extinct, and Prairie Ban Potawatomi near extinct, for the purposes of Title V funding but it

disregarded it, which is arbitrary and capricious. *Guindon*, 31 F. Supp. 3d at 195.

Nor has the Government proffered any sound explanation for ignoring the population data it requested and received. Although the Government determined that "[t]ribal enrollment" data in the IHBG table was inaccurate, it never explained how or why it ignored the Certified Tribal Enrollment Data it requested and received. More importantly, the Government has never explained why the data it requested and received was ignored in favor of IHBG Data that is obviously false and effectively renders some, but not others, extinct or grossly reduced for the purposes of Title V funding. The administrative record is devoid of any underlying explanation, discussion or analysis about the treatment of tribes with obviously false data. This lack of explanation alone is arbitrary and capricious. *See A.L. Pharma, Inc.*, 62 F.3d at 1491 (noting an agency is required to explain its decision); *Swedish Am. Hosp.*, 773 F. Supp. at 14 (requiring explanation for a challenged action).

Instead, the Government relied on the unsupported assertions that Tribal governments are "familiar with [the IHBG population metric] and already have been provided the opportunity to scrutinize and challenge its accuracy," which the Government asserted, in conclusory fashion, was "reliable and consistently-prepared." (*Id.*). The Government never provided support for these assertions -and there is none in the administrative record - as is required for reasoned decision-making. *See Mozilla Corp.*, 940 F.3d at 49.

In fact, these assertions are contradicted by the IHBG Data itself. According to the Government's own tabulation, twenty-five tribes have a population of zero in the IHBG population count. (*See generally* Exhibit K). And tribes like the Prairie Band Potawatomi are assigned an artificial population of 747 rather than their Certified Tribal Enrollment Data of 4,561. The IHBG Data, therefore, plainly and directly refutes the Government's explanation for using this data, which rests solely on its assertion that Tribal governments have familiarity with the metric and

that the data are reliable. (Exhibit G, p. 2). Indeed, the IHBG Data contains no data, let alone reliable data (*id.*), for four percent of the Tribal governments for which IHBG Data is maintained. (*Id.*).

In the end, the Government's reliance on the IHBG Data – based on a rationale that was contradicted by the IHBG Data itself – was arbitrary and capricious. *See Hogen*, 613 F.3d at 190 (D.C. Cir. 2010) (overturning Interior land-into-trust action that relied on a basis contradicting other information in the record); *Shalala*, 192 F.3d at 1005 (vacating and remanding HHS determination regarding Medicare payments that provided inadequate rationale and failed to consider more recent information). The Government had no more basis to use the IHBG Data than to use the number of McDonald's located within Plaintiffs' tribal lands and is arbitrary and capricious. This amounts to nothing more than pulling numbers out of the sky. *See, e.g., Judulang v. Holder* at 55 (holding that, even where BIA has discretion to make decisions, "it must do so in some rational way. If the BIA proposed to [make its decision] . . . by flipping a coin . . . we would reverse the policy in an instant."); *Village of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011) ("If an agency fails or refuses to deploy [its] expertise—for example, by simply picking a permissible interpretation out of a hat—it deserves no deference."). Flipping a coin or picking a number out of a hat would have yielded no less inaccurate population figures for Plaintiffs than what the Government did in this case, which is fatal to the Government's merits case.[4]

---

[4] The fact that housing and transportation programs use this data is irrelevant and runs directly counter to Title V's objective. Title V awards were directed by Congress to compensate tribes for "increased expenditures related" to COVID-19. Nowhere in Title V does it state that only those tribes who have a housing or transportation programs are entitled to funds (again, a "who" decision), or that participation in those programs is a prerequisite to getting funds for increased COVID-19 expenses. Indeed, the fact that the HUD data was created for elective program awards

### 3.      The Government failed to consider an important aspect of the problem when rendering its decision.

Critically, the Government "entirely fail[ed] to consider an important aspect of the problem" when its decision effectively rendered Plaintiffs extinct or near extinct, and resulted in unreasonably insufficient funding to the Tribe. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43; *Regents*, 140 S.Ct. at 1904-05. It is axiomatic that a depopulated tribe cannot exist, let alone incur any expenses at all – including $100,000 worth of expenses, which is the minimum payment the Government provided to tribes with zero population – again a legal and factual impossibility. The mere fact that the Government distributed funds to a tribe that it claims does not exist demonstrates the $100,000 is not "based" on COVID-19 related expenses at all and, thus, fails to meet Title V statutory objectives. The Government's decisionmaking, even where discretionary, violates the APA arbitrariness prohibiting when it amounts to nothing more than "by Ouija board or dart board, rock/paper/scissors, or even the Magic 8 Ball." *MTRNY*, 405 F. Supp. 3d at 47 (D.D.C. 2019).[5] The Government has acted arbitrarily and capriciously, and fundamentally failed to honor Congress' intent as enacted in Title V.

### D.      The Government Ignored Better Metrics that Would Have Actually Captured Tribal Population and that Would have Been More Consistent with Increased Expenditures

Where agencies fail to consider information available to them that may better serve their needs, or fail to articulate a satisfactory rationale for not relying upon that information, their actions

---

is illustrative of the fact that it is entirely unrelated to Title V objectives to compensate for non-elective COVID-19 expenses.

[5] There is also no dispute that the Government failed to consult with Plaintiffs with respect to the decision to use the objectively false IHBG population data. Instead, the Government claims they did not have to, despite express language requiring it to consult the tribes in determining CARES Act awards and their admission they are not the experts. The Government has independently failed to provide any valid basis for their failure to meet this objective of the statute, which does not piecemeal or diminish in any way the Government's duty to consult.

will not be sustained. *Butte*, 613 F.3d at 194 (overturning agency action where agency failed to explain why it rejected information); *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 11 (D.C. Cir. 2006) (remanding FDA action where agency failed to state its rationale); *Shalala*, 192 F.3d at 1005 (vacating and remanding HHS determination regarding Medicare payments that provided inadequate rationale and failed to consider more recent information).

For the reasons set forth above, the IHBG Data is not suitable for the Government's own stated purpose of making the Population Award on the basis of Tribal population. The Government's choice of the IHBG Data is even more arbitrary and capricious because the Government possessed at least two additional sources of data that were superior to the IHBG Data for the purpose of estimating population, the factor that the Government itself determined would predict increased expenditures due to COVID-19.

First, HUD regularly maintains the HUD Enrollment Data. (Exhibit K (Column: "Enrollment".) The Government had access to this regularly maintained alternative metric that relied on a far superior methodology (*i.e.*, actual Tribal population) and possessed at least the same indicia of reliability that the Government praised regarding the IHBG Data. (Allocation Document (Exhibit H, p. 2). Second, the Government could have relied on the Certified Tribal Enrollment Data that the Government itself *solicited* from Tribal governments in connection with the allocation of Title V Funds.

Taken together, the Government had two more recent, more relevant and equally reliable metrics to use. The Government did not adopt these and the Government's decision failed to document - as reflected in the administrative record - any consideration of them. The Government's allocation was therefore arbitrary and capricious. *Butte*, 613 F.3d at 194; *Alpharma, Inc. v. Leavitt*, 460 F.3d at 11; *Shalala*, 62 F.3d at 1491.

E.      **The Administrative Record Provides No Support for the Government's Selection of the IHBG Data.**

The Government's administrative record produced to this Court is completely devoid of any rational explanation for the Government's selection and use of the IHBG Data. The Government had a statutory obligation to consult with the Department of the Interior (through the BIA) and Tribal governments. 42 U.S.C. §801(c)(7). The administrative record demonstrates that, for the purpose of population, BIA preferred an enrollment approach. (Exhibit G, p.2).

In short, the Government's selection of the IHBG Data comes from thin air. The Government never advised tribes or anyone else that it would use the IHBG Data, nor did the Government seek to confirm the accuracy or appropriateness of correlating population data with Tribal governments, before the Government adopted the IHBG Data (Exhibit H) and made near immediate distributions relying thereon. (Exhibit D (Rupnick Dec.), pp. 2-3, ¶ 8). In particular, Tribal governments had no reason to expect that the Government would select the IHBG Data as the basis for awarding funds, especially where Tribal governments had just submitted their Certified Tribal Enrollment Data to the Government. (*See Id.*, ¶¶ 7-8). Tribal governments were, therefore, deprived of a reasonable opportunity to consult on the weaknesses of the metric the Government selected. *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994) ("Something is not a logical outgrowth of nothing. The notice of proposed rulemaking contains nothing, not the merest hint, to suggest [the agency's course of action].").

Given such a failure to give Tribal governments notice of the basis for its allocation, the Government effectively evaded its statutory obligation to consult with Tribal governments. It therefore follows that this Court should vacate the Government's allocation, as an arbitrary and capricious action pursuant to 5 U.S.C. § 706(a) *and* as an action taken "without observance of procedure required by law," pursuant to 5 U.S.C.A. § 706(d). *See Kooritzky*, 17 F.3d at 1513.

The Government similarly failed to observe its statutory obligation to confer with the Secretary of the Interior. The Government ignored BIA's recommendation to use Certified Tribal Enrollment Data, then failed to even explain its reason for rejecting BIA's recommended course of action. The Government's sophomoric praise for the IHBG Data cannot constitute meaningful conferral or justify the Government's veto of the course of action prescribed by an expert agency. After all, the alleged strengths that the Government learned about IHBG were known to BIA when BIA recommended Certified Tribal Enrollment Data. (Exhibit G, p. 2). The Government's unexplained rejection of federal agency expertise was arbitrary and capricious and separately violated the Government's obligation to confer with BIA.

**F.**     **The Court has Authority to Fashion a Remedy for Plaintiffs**

**1.**     **The Court Has Equitable Authority to Order Specific Relief.**

This Court has authority to compel the Government to disburse the monetary relief mandated by the CARES Act. *See Resolute Forest Prods. v. United States Dep't of Agri.*, 219 F. Supp. 3d 69, 80 (D.D.C. 2016) (granting Plaintiff's specific relief against USDA and directing the Secretary "to issue Plaintiff a full refund of its assessment."); *Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059, 1068 (D.S.D. 2007) (ordering the Secretary of the Interior to disburse withheld "$303,368 in SY 06-07 funds" under the Indian Self-Determination and Education Assistance Act for failing to comply with declination statutes and regulations); *America's Cmty. Bankers v. FDIC*, 200 F.3d 822, 831 (D.C. Cir. 2000) ("if we found for [Plaintiff] on the merits, we could order the FDIC to give them a credit against future FICO assessments as opposed to a cash refund of past assessments."); *Cobell v. Norton*, 240 F.3d 1081, 1107 (D.C. Cir. 2001) (rejecting argument that "insofar as plaintiffs sought relief under the APA, the district court exceeded its power by ordering the Interior and Treasury Departments to take the specific actions toward fulfilling their fiduciary obligations."); *Bronston v. Kemp*, 722 F. Supp. 372, 378–79 (S.D.

Ohio 1989) (finding that, under HUD program, "Plaintiffs are entitled to recover rent rebates . . . in accordance with the provisions of 24 C.F.R. § 813.110(f)" and that "Plaintiffs' request for restitution of rent rebates is in the nature of an 'equitable suit for specific monetary relief' to which there is no bar to recovery.").

On the February 25, 2021 Status Conference before this Court, the Government argued that the only available remedy was a remand, citing *North Carolina Fisheries Association v. Gutierrez.* 550 F.3d 16 (D.C. Cir. 2008). In *North Carolina Fisheries Association*, the D.C. District Court held that the Department of Commerce "had not complied with its statutory obligation" to design a fishing plan" and ordered the Parties to confer on an appropriate remedy. *Id.* at 17. The D.C. Circuit disagreed with the District Court, reasoning that "the district court, sitting as a court in review of agency action under the Act and APA, should have done what a court of appeals *normally* does when it identifies an agency error: remand to the agency for further proceedings." *Id.* at 20 (emphasis added). It continued "[o]nly in *extraordinary circumstances* do we issue detailed remedial orders, and this maxim applies equally to district courts acting in an agency review capacity." *Id.* (emphasis added). The Plaintiffs' COVID-19 related litigation falls squarely within the exception noted in *North Carolina Fisheries Association*. Few circumstances could be more extraordinary than here where available funds have been designated to mitigate the effects of a once-in-a-century pandemic and can be immediately directed to Plaintiffs.

The Court should exercise its equitable authority under the APA to address these extraordinary circumstances by compelling the monetary relief mandated by the CARES Act.  The APA empowers the Court to review "final agency action for which there is no other adequate remedy in a court" and to issue remedies "other than money damages."  5 U.S.C. §§ 702, 704. Here, "not every award of money qualifies as 'money damages' for purposes of the APA."

*ITSServe All., Inc. v. Cuccinelli*, --- F. Supp. 3d ---, 2020 WL 6743020, at *4 (D.D.C. Nov. 17, 2020) (Mehta, J.).  In the seminal case *Bowen v. Massachusetts*, 487 U.S. 879 (1988), the Supreme Court held that courts have authority to issue monetary remedies under the APA if they fall outside the definition of "money damages." *Id.* at 893. In so ruling, the Supreme Court drew a sharp distinction between "money damages" (which *substitute* for a loss) and the equitable remedy of specific performance (which mandates monetary payments required by statute):

> Damages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled."

*Id*. at 895 (citation omitted).  A court has authority to order monetary payment under the APA if the suit "seeks[s] to enforce the statutory mandate itself, which happens to be one for the payment of money" and does not seek "money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated."  *Id.* at 900 (emphasis in original).  Put another way, "[w]here a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief, not damages" and the Court can award that specific relief under the APA. *Am.'s Cmty. Bankers v. Fed. Deposit Ins. Corp.*, 200 F.3d 822, 829 (D.C. Cir. 2000); *accord ITSServe Alliance*, --- F. Supp. 3d ---, 2020 WL 6743020, at *15–16.[6]

Here the Court has authority to order the distribution of money as a remedy in this case, to enforce the CARES Act mandate that the Government "shall pay" the appropriated CARES Act

---

[6] By contrast, claims that *do* seek money damages against the United States must be pursued under the Tucker Act and (if over $10,000) exclusively in the Court of Federal Claims.  28 U.S.C. §§ 1346(a)(2), 1491(a); *see also* 28 U.S.C. § 1505 (expressly extending Tucker Act jurisdiction to claims by Indian Tribes).  Tucker Act claims for money damages and APA claims for monetary relief are mutually exclusive.  The APA covers claims "for which there is no other adequate remedy." 5 U.S.C. § 704.  When no adequate remedy exists under the Tucker Act (because the claim is not for "money damages"), there is a remedy under the APA.  Conversely, when an adequate remedy does exist under the Tucker Act (because the claim is for "money damages"), there is no APA remedy.

funds to Tribal governments "not later than 30 days after" March 27, 2020. 42 U.S.C. § 801(b)(1). Indeed, this Court evidently *already has decided* that it has such authority.  In *Agua Caliente*, the Court issued a monetary-relief order under the APA to enforce that very same statutory mandate, by "compelling the Secretary to distribute . . . [CARES Act] funds." *Agua Caliente Band of Cahuilla Indians, et al.*, Case No. 20-cv-01136 (APM), 2020 WL 3250701, at *8.

Such monetary relief is proper under the APA, because it is not an award of "money damages."  The recent decision in *Lummi Tribe of the Lummi Reservation v. United States* strongly supports this conclusion. 870 F.3d 1313, 1320 (Fed. Cir. 2017). In *Lummi*, the Federal Circuit reviewed an analogous claim for monetary relief under the same Indian Housing Block Grant ("IHBG") program implicated by the Government's methodology in the present case.  The plaintiff tribes in *Lummi* had received IHBG grants which — like the CARES Act distributions at issue here — had to be spent only on activities specified in the statute.  The defendant agency (HUD) alleged that the statutory restrictions had not been followed, claimed the plaintiff tribes had been overpaid as a result, and offset the alleged overpayments against future grants to the same tribes. The tribes sued to recoup the disputed grant money, arguing that "HUD improperly deprived them of grant funds to which they were entitled" under the statute (*id*. at 1316) — just as plaintiffs claim the Government has improperly deprived them of CARES Act funds to which it is entitled under the CARES Act. The Federal Circuit held that the claims in *Lummi* were for equitable relief, not "money damages," because the plaintiffs sought a remedy for having "been allocated too little in grant funding." *Id*. at 1318.  Here, plaintiffs seek a directly analogous equitable remedy for an under-allocation of CARES Act funds (properly asserted under the APA), not money damages.

      2.      **The Court's Specific Relief Should Direct Distributions to Plaintiffs That Would Treat Them the Same as Other Tribes with Equivalent Populations.**

The Court's specific relief should direct CARES Act distributions to Plaintiffs that would treat them the same as other tribes with equivalent populations. A "fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). It is axiomatic that an agency must treat similarly-situated parties the same way unless there is a legitimate rationale for treating them differently. *See, e.g.*, *Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2007) ("[A]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."); *Seaworld of Fla., LLC v. Perez*, 748 F.3d 1202, 1221 (D.C. Cir. 2014) ("treating similar cases dissimilarly [is] the paradigmatic arbitrary and capricious agency action").

Here there is no legitimate basis for distinguishing the Plaintiff tribes from other tribes with equivalent populations who received larger distributions. The Court, therefore, should direct the Government to make distributions to Plaintiffs that (when combined with population-based distributions previously received) are the same as those made to other tribes with equivalent populations. The Court should further direct that the population determinations as to the Plaintiffs must be made with reliable, objective data (such as Certified Enrollment data) and not with data from the IHBG database.

## <u>CONCLUSION</u>

Based on the foregoing and pursuant to Federal Rule of Civil Procedure 56, this Court should grant judgment to Plaintiffs and direct the Government to distribute Title V funds to Plaintiffs in reliance on reliable, objective data and in proportion to the manner in which the Government directed funds to Tribal governments with equivalent populations.

Respectfully submitted this 2nd day of April, 2021.

Respectfully submitted,

*/s/ Pilar M. Thomas*
Jonathan Labukas
    (D.C. Bar 998662)
QUARLES & BRADY LLP
1701 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20006
Phone: (202) 372-9514

Pilar M. Thomas
    (*Admitted Pro Hac Vice*)
QUARLES & BRADY LLP
One South Church Avenue, Suite 1800
Tucson, Arizona 85746

Nicole L. Simmons
    (*Admitted Pro Hac Vice*)
QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391

*Attorneys for Plaintiff The Shawnee Tribe*

Daniel Francis Diffley
George Blay Abney , I
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309

Daniel Jarcho
ALSTON & BIRD LLP
The Atlantic Building
950 F Street, NW
Washington, DC 20004-1404

Jean Richmann
ALSTON & BIRD
560 Mission Street, Ste 2100
San Francisco, CA 94105

*Attorneys for Plaintiff Miccosukee Tribe of Indians
of Florida*

Carol Heckman
James Peter Blenk
LIPPES MATHIAS WEXLER FRIEDMAN, LLP
50 Fountain Plaza, Suite 1700
Buffalo, NY 14202

Michael G. Rossetti
LIPPES MATHIAS WEXLER FRIEDMAN LLP
1900 K Street NW, Suite 730
Washington, DC 20006

*Attorneys for Plaintiff Prairie Bank Potawatomi
Nation*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

The undersigned hereby certifies that on the 2nd of April, 2021, the foregoing document was filed with the Court using the CM/ECF system and served which provided service to all parties through their attorney of record.

_/s/ Dawn McCombs_
_____
